# EXHIBIT C

Dockets.Justia.com

1   MANATT, PHELPS & PHILLIPS, LLP
    STEPHEN M. RYAN (DC Bar No. 359099) (sryan@manatt.com)
2   700 12th Street, N.W., Suite 1100
    Washington, DC  20005-4075
3   Telephone:  (202) 585-6500
    Facsimile:   (202) 585-6600
4
    MANATT, PHELPS & PHILLIPS, LLP
5   CHAD S. HUMMEL (CA Bar No. 139055) (chummel@manatt.com)
    JACK S. YEH (CA Bar No. 174286) (jyeh@manatt.com)
6   11355 W. Olympic Boulevard
    Los Angeles, CA  90064
7   Telephone:  (310) 312-4000
    Facsimile:   (310) 312-4224
8
    MANATT, PHELPS & PHILLIPS, LLP
9   CHRISTOPHER L. WANGER (CA Bar No. 164751) (cwanger@manatt.com
    JOHN P. KERN (CA Bar No. 206001) (jkern@manatt.com)
10  1001 Page Mill Road, Building 2
    Palo Alto, CA  94304-1006
11  Telephone:  (650) 812-1300
    Facsimile:   (650) 213-0260
12
    Attorneys for
13  AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD.

14

15                        UNITED STATES DISTRICT COURT

16                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

17                             SAN JOSE DIVISION

18

19  GARY KREMEN, an individual,            Case No. **C-98-20718 JW**

20              Plaintiff,                 **ADMINISTRATIVE MOTION TO
                                           CONSIDER WHETHER CASES SHOULD
21       vs.                               BE DESIGNATED AS RELATED**

22  STEPHEN MICHAEL COHEN, et al.          Related Case No. **C-06-2554-MMC**

23              Defendants.                [N.D. Local Rule 3-12 and 7-11]

24

25          PLEASE TAKE NOTICE that, pursuant to Northern District Local Rules 3-12 and 7-11,

26  non-party American Registry for Internet Numbers, Ltd. ("ARIN"), hereby submits this

27  Administrative Motion to have the Court designate this case and the later-filed case of *Kremen v.*

MANATT, PHELPS &
PHILLIPS, LLP 28
ATTORNEYS AT LAW
PALO ALTO
                              ADMIN MOTION TO CONSIDER WHETHER
                                    CASES SHOULD BE RELATED
                                   CASE NO. **C-98-20718 JW**

1    *American Registry for Internet Numbers, Ltd.* (U.S.D.C. N.D. Cal. Case No. C-06-2554-MMC) -

2    pending before the Honorable Maxine M. Chesney in the Court's San Francisco Division (the

3    "Related Case") - as Related Cases.

4    **Parties:** This case and the Related Case both involve Gary Kremen ("Kremen") as the

5    sole plaintiff. Although ARIN is not a party to this case, an Order was issued herein directing

6    ARIN to take certain actions as discussed further below. Both the Related Case and this case

7    include claims by Kremen to ownership of specific Internet Protocol resources ("IP Resources"

8    includes both IP addresses and Autonomous System Numbers) and Kremen's claims that ARIN

9    can be forced to register these IP Resources in Mr. Kremen's name without regard for ARIN's

10   registration procedures. ARIN controls the registration and assignment of the IP Resources to

11   which Kremen claims ownership. ARIN denies that Mr. Kremen "owns" the IP resources or that

12   they are "property".

13   In September 2001, Mr. Kremen obtained in this case by an *ex parte* application without

14   notice to ARIN an Order issued by the Honorable James Ware directing ARIN to register in Mr.

15   Kremen's name certain specified IP Resources. (The "September 2001 Order"). A true and

16   correct copy of the September 2001 Order is attached as Exhibit A to the Request for Judicial

17   Notice filed in support of this motion. In the Related Case, Mr. Kremen has sued ARIN for

18   allegedly violating the September 2001 Order (defined by Mr. Kremen in the Related Case as the

19   "NETBLOCK ORDER") by failing to register in his name the IP Resources that are the subject of

20   the September 2001 Order. *See e.g,.* ¶¶ 12-17 and 46-83 of Mr. Kremen's complaint against

21   ARIN in the Related Case attached as Exhibit B to the accompanying Request for Judicial Notice.

22   **Same Transaction, and Events:** This case and the Related Case concern the same

23   transaction and events. The only "transactions" and "events" at issue in the Related Case concern

24   ARIN's compliance with the September 2001 Order issued in this case. Because that Order was

25   issued without notice or due process to ARIN, and requires ARIN to take certain actions that are

26   beyond its control, ARIN contends that the order is void and should be modified. Concurrently

27

Manatt, Phelps &
Phillips, LLP 28
Attorneys At Law
Palo Alto

2

ADMIN MOTION TO CONSIDER WHETHER
CASES SHOULD BE RELATED
CASE NO. **C-98-20718 JW**

1   with the filing of this Administrative Motion, ARIN is filing in this case a Motion For

2   Modification of the September 2001 Order.  If ARIN's Motion to Modify the September 2001

3   Order is granted, all or most of Mr. Kremen's claims in the Related Action should be rendered

4   moot.

5   **Unduly Burdensome Duplication of Labor and Expense and Likelihood of**

6   **Conflicting Results:**  It is likely there will be an unduly burdensome duplication of labor and

7   expense and possible conflicting results if the Related Case is heard by a new judge unfamiliar

8   with the facts and arguments underlying the September 2001 Order.  Judge Ware presided over

9   and adjudicated the merits of Kremen's original lawsuit and authored the Order which is at the

10  core of Kremen's claims in the Related Case.  Because ARIN is seeking from Judge Ware a

11  modification of that Order and further because all of Mr. Kremen's claims in the Related Action

12  depend on the validity, effect and interpretation of that Order, it is only proper that this case be

13  assigned to Judge Ware to preclude any conflicting results.

14     For the foregoing reasons, ARIN respectfully requests that this Court order that this case

15  and the Related Case be designated as "Related," and that the Related Case be reassigned to

16  Judge Ware.

17  Dated: June 8, 2006                           MANATT, PHELPS & PHILLIPS, LLP

18

19                                  By:    /s/ Christopher L. Wanger

20                                         Christopher L. Wanger
                                           *Attorneys for*
21                                         AMERICAN REGISTRY FOR INTERNET
                                           NUMBERS, LTD.

22

23  20159339.1

24

25

26

27

Manatt, Phelps &
Phillips, LLP 28
Attorneys At Law
Palo Alto

3                    ADMIN MOTION TO CONSIDER WHETHER
                     CASES SHOULD BE RELATED
                     CASE NO. **C-98-20718 JW**

# Motions

5:98-cv-20718-JW Kremen, et al v. Cohen, et al **CASE CLOSED on 03/23/2004**

### U.S. District Court

### California Northern District

Notice of Electronic Filing

The following transaction was received from Wanger, Christopher L. entered on 6/8/2006 at 5:39 PM and filed on 6/8/2006

**Case Name:**       Kremen, et al v. Cohen, et al
**Case Number:**     5:98-cv-20718
**Filer:**           American Registry For Internet Numbers Ltd.
**WARNING: CASE CLOSED on 03/23/2004**
**Document Number:** 1163

**Docket Text:**
MOTION to Consider Whether Cases Should Be Designated as Related filed by American Registry For Internet Numbers Ltd.. (Attachments: # (1) Proposed Order Designating Cases as Related)(Wanger, Christopher) (Filed on 6/8/2006)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** P:\e-filing PA\Administrative Motion.pdf
**Electronic document Stamp:**
[STAMP CANDStamp_ID=977336130 [Date=6/8/2006] [FileNumber=2664756-0] [ b185a44b3f140af67d61ef429415effc1cad819f0c07ceeb56d296d8fd0b17cceda59f caccdd3a2c53bcca7435fdc128519a49f9250e0dc1b00d53cf0f06d2c4]]
**Document description:** Proposed Order Designating Cases as Related
**Original filename:** P:\e-filing PA\Proposed Order Designating.pdf
**Electronic document Stamp:**
[STAMP CANDStamp_ID=977336130 [Date=6/8/2006] [FileNumber=2664756-1] [ 0ab9b8adfe1fd33080b1db266ef83f5d3d0c1bb57bc8a9287635ce325f6723c78c52af 109bc6e0cb1af98db847ffd9606b9d7deb37013a9a86dc4ac2dd0a73da]]

## 5:98-cv-20718 Notice will be electronically mailed to:

Patricia De Fonte    Patricia.DeFonte@ibslaw.com, liz.torres@ibslaw.com; richard.idell@ibslaw.com

David Henry Dolkas    ddolkas@mwe.com

Richard J. Idell    richard.idell@ibslaw.com, patricia.defonte@ibslaw.com; june.hight@ibslaw.com; liz.torres@ibslaw.com; ory.sandel@ibslaw.com

Glen H. Isaacs    invalidaddress@invalidaddress.com

James M. Wagstaffe     wagstaffe@kerrwagstaffe.com, milla@kerrwagstaffe.com

Christopher L. Wanger     cwanger@manatt.com, tmartin@manatt.com; etobar@manatt.com;
dwishon@manatt.com; gdarwish@manatt.com; uvu@manatt.com; lvete@manatt.com

George G. Weickhardt     gweickhardt@ropers.com, emangonon@ropers.com; mmcpherson@ropers.com

**5:98-cv-20718 Notice will be delivered by other means to:**

Stephen Michael Cohen
C/O Robert Meredith, Esq.,
1111 Brickyard Road #206
Salt Lake City, UT 84106

Joel Dichter
Campeau & Thomas
55 So Market St Ste 1040
San Jose, CA 95113

Timothy P. Dillon
Dillon & Simonsen, APC
4660 La Jolla Village Dr., Suite 775
San Diego, CA 92122

David H. Dolkas
DLA Piper Rudnick Gray Cary US LLP
2000 University Circle
East Palo Alto, CA 94303-2248

John A. Goalwin
350 So. Figueroa Street, Suite 499
Los Angeles, Ca 90071

Kevin C. Golden
Hanson and Molloy
1250 Eye Street, N.W.
Suite 701
Washington, DC 20005

Kathryn E. Karcher
Gray Cary Ware & Freidenrich
401 B Street
Suite 1700
San Diego, CA 92101-4297

H. Scott Leviant
Stanbury Fishelman Wisner & Adsit
Los Angeles Office
9200 Sunset Blvd., Penthouse 30
West Hollywood, Ca 90069-3601

S. Tye Menser
DLA Piper Rudnick Gray Cary US LLP
2000 University Circle
East Palo Alto, CA 94303-2248

Steven G. Ross
Duboff & Ross
Hampton Oaks, 2nd Floor
6665 S.W. Hampton Street
Portland, OR 97223-8357

Ory Sandel
Idell & Seitel LLP
465 California Street
Suite 300
San Francisco, CA 94104

Philip L. Sbarbarò
21355 Ridgetop Circle
Dulles, VA 20166

Nadya Y. Spivack
Dillon & Simonsen, APC
4660 La Jolla Village Dr., Suite 775
San Diego, Ca 92122

George Stanbury
Stanbury Fishelman Wisner & Adsit
Los Angeles Office
9200 Sunset Blvd., Penthouse 30
West Hollywood, Ca 90069-3601

Alec B. Wisner
Stanbury Fishelman Wisner & Adsit
Los Angeles Office
9200 Sunset Blvd., Penthouse 30
West Hollywood, Ca 90069-3601

# EXHIBIT A

1  MANATT, PHELPS & PHILLIPS, LLP
   STEPHEN M. RYAN (DC Bar No. 359099) (sryan@manatt.com)
2  700 12th Street, N.W., Suite 1100
   Washington, DC  20005-4075
3  Telephone:  (202) 585-6500
   Facsimile:   (202) 585-6600
4
   MANATT, PHELPS & PHILLIPS, LLP
5  CHAD S. HUMMEL (CA Bar No. 139055) (chummel@manatt.com)
   JACK S. YEH (CA Bar No. 174286) (jyeh@manatt.com)
6  11355 W. Olympic Boulevard
   Los Angeles, CA  90064
7  Telephone:  (310) 312-4000
   Facsimile:   (310) 312-4224
8
   MANATT, PHELPS & PHILLIPS, LLP
9  CHRISTOPHER L. WANGER (CA Bar No. 164751) (cwanger@manatt.com)
   JOHN P. KERN (CA Bar No. 206001) (jkern@manatt.com)
10 1001 Page Mill Road, Building 2
   Palo Alto, CA  94304-1006
11 Telephone:  (650) 812-1300
   Facsimile:   (650) 213-0260
12
   Attorneys for
13 AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD.

14

15                   UNITED STATES DISTRICT COURT

16              FOR THE NORTHERN DISTRICT OF CALIFORNIA

17                        SAN JOSE DIVISION

18

19 GARY KREMEN, an individual,          Case No. C-98-20718 JW

20              Plaintiff,              **REQUEST FOR JUDICIAL NOTICE OF**
                                        **(1) MAY 2006 COMPLAINT AND**
21     vs.                             **(2) SEPTEMBER 2001 COURT ORDER**

22 STEPHEN MICHAEL COHEN, et al.        Related Case No. C-06-2554-MMC

23              Defendants.             [Fed. R. Evid. 201]

24

25 **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

26      Non-party American Registry for Internet Numbers, Ltd. ("ARIN"), hereby respectfully

27 asks this Court to take judicial notice, pursuant to Federal Rule of Evidence 201, of the following

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

28                                      REQUEST FOR JUDICIAL NOTICE
                                        CASE NO. C-98-20718 JW

ARIN adv. Gary Kremn
(22149-060)
C. Wanger       D. Wishon
S. Ryan (DC)    Client (CLW)
C. Hummel (LA)  LA Calendar

1    documents, filed in support of ARIN's Administrative Motion to Consider Whether Cases Should

2    be Designated as Related:

3        **Exhibit A**: The Complaint filed by Gary Kremen in the action entitled *Kremen v.*

4    *American Registry for Internet Numbers, Ltd.* (U.S.D.C. N.D. Cal. Case No. C-06-2554-MMC),

5    currently pending before the Honorable Maxine M. Chesney in the Court's San Francisco

6    Division; and

7        **Exhibit B**: The September 2001 Order issued by the Honorable James Ware in the above-

8    caption case, directing ARIN to register in Mr. Kremen's name certain specified IP Resources.

9

10       ARIN makes this request pursuant to Federal Rules of Evidence Rule 201(b).  Federal

11   Rule of Evidence 201(b) states that judicial notice shall be taken of facts "capable of accurate and

12   ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.

13   R. Evid. 201(b)(2).

14       Here, ARIN requests that judicial notice be taken of (1) a Complaint (**Exhibit A**) which

15   was filed with this Court's San Francisco Division and which is publicly-available for viewing

16   and verification, and (2) an Order (**Exhibit B**) which this very Court authored, issued, and

17   maintains on file.  Federal courts throughout the country have long held that judicial notice shall

18   be taken in these circumstances, where there is no dispute as to the authenticity of the documents.

19   *See e.g. United States v. Ritchie*, 342 F.3d 903, 909 (9th cir. 2003) ("Courts may take judicial

20   notice of certain public records"); *see also Blair v. City of Pomona*, 223 F.3d 1075 (9th Cir. 2000)

21   (taking judicial notice of a public commission's report).

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

2

REQUEST FOR JUDICIAL NOTICE
CASE NO. **C-98-20718 JW**

1      For the foregoing reasons, ARIN respectfully requests that this Court take judicial notice

2 of the documents appended hereto as **Exhibits A** and **B**.

3 Dated: June 8, 2006              MANATT, PHELPS & PHILLIPS, LLP

4

5                 By:    /s/ Christopher L. Wanger

6                         Christopher L. Wanger
                        *Attorneys for*

7                         AMERICAN REGISTRY FOR INTERNET
                        NUMBERS, LTD.

8

9 20159297.1

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

MANATT, PHELPS &
PHILLIPS, LLP 28
ATTORNEYS AT LAW
PALO ALTO

3

# Exhibit A
## to the
### Request for Judicial Notice of (1) May 2006 Complaint and (2) September 2001 Court Order

1    **KRONENBERGER HANLEY, LLP**
Karl S. Kronenberger (Bar No. 226112)
2    Terri R. Hanley (Bar No. 199811)
220 Montgomery Street, Suite 1920
3    San Francisco, CA 94104
Telephone: (415) 955-1155
4    Facsimile: (415) 955-1158

5    Attorneys for Plaintiff GARY KREMEN

6

7

8        UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF CALIFORNIA

9

10

11    **GARY KREMEN,** an individual,

12            Plaintiff,

13        vs.

14    **AMERICAN REGISTRY FOR INTERNET**
**NUMBERS, LTD.,** a Virginia corporation,
15

16            Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

Case No.

**C 06 2554**

**COMPLAINT FOR VIOLATION OF
ANTITRUST LAWS; CONVERSION;
UNFAIR BUSINESS COMPETITION;
BREACH OF FIDUCIARY DUTY**

**DEMAND FOR JURY TRIAL**

ORIGINAL FILED

APR 12 2006

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing MEJ

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

COMPLAINT

TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................... 4

II.   BACKGROUND ...................................................................................... 6

      A.  The Internet, IP Addresses and Domain Names.............................. 6

      B.  History of the Allocation and Management of IP Addresses .............. 8

      C.  Defendant ARIN ........................................................................... 10

III.  ARIN's ANTICOMPETITIVE INTERESTS ............................................. 11

      A.  Large ISP Industry Participants Serve as ARIN Management............. 11

      B.  ARIN Management Gave Itself Absolute Discretion Over Policy Development
          and Administration ....................................................................... 12

      C.  Actual Control of ARIN Board is Held By Prominent ISP Industry Leaders In
          Competition With Applicants Seeking Allocation............................... 12

IV.   ARIN's ANTICOMPETITIVE AND WRONGFUL ACTS ........................... 16

      A.  Refusal to Transfer Registration of Specified NETBLOCK PROPERTY to Plaintiff
          KREMEN..................................................................................... 17

      B.  Act of Conditioning Plaintiff's (and Others') Registration Upon Submission of
          Detailed Disclosure of Trade Secrets, and Confidential Commercial and Private
          Information. ................................................................................. 17

      C.  Act of Conditioning KREMEN's (and Others') Registration of Addresses Upon
          Acceptance of "Grab Back" Provisions that Render ARIN's Performance Illusory. 19

      D.  Act of Conditioning KREMEN's (and Others') Registration of Addresses upon
          Submission, for Public Disclosure, of Private and Confidential Information. .......... 21

      E.  ARIN's Policies Favor Large "Backbone" Internet Providers and Other Large
          Organizations Over Smaller Competitors........................................ 22

V.    INJURY TO PLAINTIFF ......................................................................... 22

      A.  Wrongfully Depriving Plaintiff of Benefit of Use and Control of NETBLOCK
          PROPERTY. ................................................................................ 22

          i.  Forgone existing revenue.......................................................... 22

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

COMPLAINT

i

ii.  Forgone potential revenue ........................................................ 23

B.  Wrongful and Knowing Enrichment of COHEN and His Interests Directly Adverse

to KREMEN, by maintaining COHEN's Registration of the NETBLOCK

PROPERTY, to Direct and Known Detriment of KREMEN. .................................. 23

C.  Substantially Interfering with Plaintiff's Constructive Trust on Assets Utilizing

NETBLOCK PROPERTY. ........................................................................ 24

D.  Devaluation of the NETBLOCK PROPERTY and its Market ............................ 25

VI.  CLAIMS FOR RELIEF ................................................................................ 35

VII.  PRAYER FOR RELIEF .............................................................................. 26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

ii

COMPLAINT

Plaintiff Gary Kremen ("KREMEN"), through his attorneys of record Kronenberger Hanley, LLP, brings this action against Defendant American Registry For Internet Numbers, LTD. ("ARIN"), and alleges as follows:

## JURISDICTION AND VENUE

1.    This complaint is brought under Sections 16 of the Clayton Act, 15 U.S.C. § 26, and California Business & Professions Code §17200 et seq., to prevent and restrain violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§1 and 2), and of California Business & Professions Code § 16720 et seq., and otherwise unlawful business practices, and for damages under Section 4 of the Clayton Act (15 U.S.C. §15) and related state law claims for relief for damages resulting from Defendant ARIN's antitrust violations and otherwise unlawful business practices, breaches, and tortious acts.

2.    Subject matter jurisdiction is conferred upon this Court by 15 U.S.C. §§ 1, 2, and 15, 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1337 (antitrust). Supplemental jurisdiction over claims arising under the law of the State of California is conferred upon this Court under 28 U.S.C. §1367.

3.    Diversity jurisdiction in conferred upon this Court by 28 U.S.C. § 1332, as perfect diversity exists between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.    This Court has personal jurisdiction over Defendant ARIN, as it keeps offices in California, regularly conducts business in California, has entered numerous contracts with residents of California, and currently controls a large amount of property owned by California residents.

5.    Venue in this District is proper under 28 U.S.C. §1391 and 15 U.S.C. § 22. Plaintiff's claims arise in the Northern District of California, and in the County of San Francisco. Defendant's acts giving rise to this action occurred in this District. A substantial portion of the activity which is the subject of this complaint has occurred and continues to occur in this District, and the damages suffered by Plaintiff were suffered, at

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

COMPLAINT

2

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

1   least in part, in this District. The interstate trade and commerce involved in and affected

2   by the alleged violations of the antitrust laws was and is carried on in part within this

3   District. The acts complained of have had, and will have, substantial anticompetitive

4   effects in this District.

## INTRADISTRICT ASSIGNMENT

6.      For the purposes of Local Rule 3-2(c), this action arises in San Francisco,

where a substantial part of the events or omissions which give rise to the claims alleged

herein occurred and in which a substantial part of the property that is the subject of this

action is located.

## THE PARTIES

7.      Plaintiff KREMEN is an individual, residing in the State of California.

8.      Defendant ARIN is corporation organized and existing under the laws of

the State of Virginia and having its principal place of business in the State of Virginia.

## RELEVANT MARKET

9.      For the purpose of KREMEN's antitrust causes of action, the relevant

market is the market for Internet Protocol addresses ("IP Addresses"), blocks of IP

addresses ("Netblocks") and Autonomous System Numbers ("ASNs"). The relevant

geographic scope of the relevant market is United States, Canada, Anguilla, Antarctica,

Antigua and Barbuda, Bahamas, Barbados, Bermuda, Bouvet Island, Cayman Islands,

Dominica, Grenada, Guadeloupe, Heard and McDonald Islands, Jamaica, Martinique,

Puerto Rico, Saint Kitts and Nevis, Saint Lucia, Saint Vincent and The Grenadines, St.

Helena, St. Pierre and Miquelon, Turks and Caicos Islands, United States Minor Outlying

Islands, Virgin Islands (British), and Virgin Islands (U.S.).

## INTERSTATE COMMERCE

10.      The policies and actions of Defendant ARIN take place in and affect

interstate trade and commerce in the United States because Internet Service Providers

("ISPs") and end users of IP addresses must obtain IP addresses and ASNs from ARIN,

and pay mandatory registration fees on such property to ARIN. ARIN has a monopoly

COMPLAINT

3

1  on such services in the relevant market. These transactions occur across state lines.

2  Additionally, Defendant ARIN's policies and actions directly and substantially affect

3  interstate commerce in that ARIN's policies interfere with and obstruct the purchase and

4  sale of valuable property of IP Addresses and AS Numbers. Such interference can and

5  does directly affect the operations of Internet-related businesses.

## I. INTRODUCTION

7     11.  Plaintiff Gary Kremen ("KREMEN") obtained a $65 million judgment,

8  entered in the U.S. District Court for the Northern District of California, against Stephen

9  Michael Cohen ("COHEN"), and against a variety of companies and alter egos of

10  COHEN (see *Kremen v. Cohen*, No. 98-20718 (JW)). This judgment, entered on April

11  3, 2001, also imposed a constructive trust on all of assets of COHEN, his companies

12  and alter egos.

13     12.  Among the property owned and held by COHEN, or his companies and

14  alter egos, at the time of the judgment were blocks of IP Addresses and ASNs

15  ("NETBLOCK PROPERTY", which will be fully defined, *infra*) that were, and currently

16  are, in commercial use and of substantial economic value. Pursuant to the April 2001

17  judgment, on September 17, 2001, the Northern District issued an order specifically

18  directing the custodian of the NETBLOCK PROPERTY, Defendant ARIN, to transfer the

19  NETBLOCK PROPERTY to KREMEN (the "NETBLOCK ORDER"). A true and correct

20  copy of this order is attached hereto as "Exhibit A."

21     13.  Despite Plaintiff's many requests, Defendant ARIN has continuously

22  refused to transfer the NETBLOCK PROPERTY to KREMEN in compliance with the

23  Order, or to in any way substantially comply with its terms. ARIN has stated that its

24  refusal to transfer the subject properties to KREMEN is pursuant to, at least in part,

25  ARIN's internal "policies," developed by the ARIN membership pursuant to their

26  economic self-interest, with the aim and intent to restrain trade and favor the ARIN

27  Members.

28

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

COMPLAINT

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

14.     Since 2001, KREMEN has been in the Internet advertising business. KREMEN owns a pay-per-click ("PPC") search engine and over 5000 domain names. KREMEN'S businesses generate revenues from attracting large amounts of Internet traffic to websites where KREMEN'S domain names reside.  KREMEN'S business and prospective businesses would have benefited greatly if KREMEN would have had control of the NETBLOCK PROPERTY from the time of the court order.  Specifically, KREMEN could have hosted thousands of his websites using various IP addresses contained in the NETBLOCK PROPERTY, which would have given KREMEN significant advantages in obtaining higher ranking within search engines, such as Google.com. Such high ranking would have translated into increased Internet traffic and greater revenues.

15.     Also since 2001, KREMEN has been unable to pursue a variety of business strategies that would have been able to exploit the value of the NETBLOCK PROPERTY.  These potential business strategies include various affiliate marketing techniques, email marketing, and hosting various types of web services hosted for customers.

16.     Defendant ARIN's refusal to comply with the 2001 NETBLOCK ORDER also harmed KREMEN because such purposeful action benefited COHEN.  This refusal by ARIN has enabled COHEN to retain ownership and possession of the NETBLOCK PROPERTY, to continue to derive economic benefit from the NETBLOCK PROPERTY, and to use the income to fund COHEN's flight, living as a fugitive, retention of domestic and foreign counsel and investigators to avoid service of process and warrants, and as leverage against in other ways.  The damages that have resulted from ARIN's wrongful actions have far surpassed what KREMEN could obtain through a contempt proceeding.

17.     KREMEN brings this action to obtain his NETBLOCK PROPERTY, to enjoin ARIN's anticompetitive policies and unfair business practices, and for related compensatory and punitive damages.

COMPLAINT

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

## II. BACKGROUND

### A.  The Internet, IP Addresses and Domain Names

18.     The Internet is a network of interconnected computers and computer networks. Every computer that is directly connected to the Internet has a unique address. These addresses, which are known as Internet Protocol ("IP") numbers, are necessary for computers to communicate with each other over the Internet. An example of an IP number might be:  170.110.225.163.

19.     Because IP numbers can be cumbersome and difficult for Internet users to remember or to use, the IP number system has been overlaid with a more "user-friendly" system of domain names -- the Internet domain name system, or "DNS."  The DNS associates a unique alphanumeric character string—or domain name—with a specific IP number.  As an example, the IP address 170.110.225.163 resolves to the U.S. Department of Commerce website, under the domain name "www.Commerce.gov."

20.     IP addresses, by their nature and by necessity, are precisely defined, in that a unique IP address must be assigned to every access point on the Internet in order to enable the correct routing of Internet traffic between points on the network.  It is therefore necessary that IP Addresses be exclusively allocated to and controlled by their owners; addresses not so allocated are held in reserve by a regional registry --such as Defendant ARIN.

21.     IP addresses are comprised of four quadrants, each containing 8 bits of information; for ease of reference, the binary values are translated at the user level into decimal values, which range from 0 to 255. [1]



---

[1] A "bit" is a single binary value and is the smallest amount of computer storage. It can have a value of 0 (false) or 1 (true).  An 8-digit (8 bit) binary number is called a byte. Translated from binary into decimal notation, a byte has a minimum value of 0 ("00000000"), and a maximum value of 255 ("11111111").

6

COMPLAINT

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

As each quadrant can have 255 unique values, this creates a total of pool of 4,294,967,296 unique IP addresses.

22.    IP addresses are managed in blocks ("NETBLOCKS"), which are defined in several ways. Traditionally, NETBLOCKS have been defined in a class system by quadrant values and levels. These NETBLOCKS can be any size; a block defined by a first quadrant value (an "A Level" domain) consists over 16 million addresses; a block defined down to a third quadrant value (a "C Level" domain) contains only 256 unique addresses.

23.    Generally speaking about Internet addressing by class (Class A, B or C), the first quadrant or quadrants in an IP address represent a network, and the latter quadrants represent potential specific hosts, which could be, among other things, specific websites or Internet users.

24.    Recently a new form of Internet addressing has emerged, called Classless Inter-Domain Routing (CIDR). In this new addressing protocol, a CIDR network address could look like this:  190.30.250.00/21. The prefix is the address of the network, or gateway, and the number after the slash indicates the size of the network. The higher the number, the more host space that is in the network.[2]

25.    For both class addressing and CIDR addressing, the value of blocks of IP addresses increases as the number of potential specific hosts increases. In businesses where IP addresses are a resource, the ability to expand and expand rapidly is related to the size of the NETBLOCKS that business holds.

26.    Additionally, bigger NETBLOCKS are inherently more efficient from a routing standpoint and thus more valuable. Due to these efficiencies, Internet Service Providers holding large NETBLOCKS are often granted preferential, if not exclusive, standing to communicate with larger ("backbone") providers, giving them a substantial

---

[2] For example, network 10.1.0.0/16 has twice as much space as 10.1.0.0/17, and four times as much as 10.1.0.0/18.

7

COMPLAINT

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

1 advantage in their competitive markets. The enhanced value of large NETBLOCKS is

2 reflected in the marketplace, in that NETBLOCKS are bought, sold, and licensed like

3 other valuable property or resources; NETBLOCK holdings are factored into the

4 valuations of both public and private companies worldwide. Furthermore, the

5 Autonomous System Numbers (ASNs) that identify each unique network on the Internet

6 also have value for similar reasons.

7     **B.  History of the Allocation and Management of IP Addresses**

8     27.    In the 1980s, the U.S. National Science Foundation ("NSF") connected its

9 high speed network to the high speed network of what is now known as the U.S.

10 Defense Advanced Research Projects Agency ("DARPA"), forming the foundation of the

11 Internet as we know it today. As the Internet grew, the increasingly more complex task

12 of assigning and keeping track of IP addresses was passed to the Defense Data

13 Network (DDN) Network Information Center (NIC), under a contract from NSF.

14     28.    In 1993, NSF signed an agreement with Network Solutions, Inc. ("NSI"),

15 under which NSI became the exclusive registrar and registry[3] of Internet domain names.

16 At the same time, NSF and NSI formed an organization named InterNIC to assume

17 control of the registration and registry of IP addresses. InterNIC shared management of

18 these responsibilities with the Internet Assigned Numbers Authority ("IANA").

19     29.    Throughout the 1990s, driven by the need to manage better the growing

20 volume of address allocations internationally and other logistical problems, the Internet

21 community began to support the proposition that IP addresses should be under the

22 management of, and administered by, those that use Internet IP addresses in respective

23 geographic locations, including ISPs, end-user organizations, corporate entities,

24 universities, and individuals. As a result, IANA began to work with Regional Intenet

25 Registries ("RIRs"), which represented various Internet communities internationally.

26 IANA's role started to transition to the role of allocating IP addresses from the pools of

27     [3] A registry is database mapping domain names to IP addresses; a registrar is an entity
that trades in the registration of domains in the registries to which it has been a granted
28 access.

COMPLAINT

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

1    unallocated addresses to the RIRs according to their established needs. When an RIR

2    required more IP addresses for allocation or assignment within its region, the IANA

3    made an additional allocation to the RIR.

4        30.     In April of 1997, Defendant ARIN was established as an independent,

5    nonprofit corporation, pursuant to the consensus of IANA and other organizations,

6    thereby becoming a RIR.  Thereafter, ARIN assumed from InterNIC and IANA the

7    exclusive responsibilities of IP address allocation for over 26 countries, including the

8    U.S. and its territories, Canada, and parts of the Caribbean.[4] ARIN now exists as the

9    largest and most active one of five regional Internet registries ("RIRs") that are

10   responsible for allocating IP address space and managing the IP address registries

11   worldwide.

12       31.     On July 1, 1997, the Clinton administration issued a report on electronic

13   commerce, "*A Framework for Global Electronic Commerce*." The report supported

14   private efforts to address Internet governance and made the Department of Commerce

15   ("DOC") the lead agency on this initiative.  Accompanying the report was a presidential

16   directive that called on the DOC to "support efforts to make the governance of the

17   domain name system private and competitive and to create a contractually based self-

18   regulatory regime that deals with potential conflicts between domain name usage and

19   trademark laws on a global basis."[5] To this end, the DOC published the "Proposal to

20   Improve Technical Management of Internet Names and Addresses" (commonly referred

21   to as the "Green Paper").

22       32.     The Internet Corporation for Assigned Names and Numbers (ICANN) is a

23   private corporation, formed in 1998, which derived from the U.S. Department of

24   [4] As of the date of filing, ARIN's territory includes Anguilla, Antarctica, Antigua and
25   Barbuda, Bahamas, Barbados, Bermuda, Bouvet Island (Norway), Canada, Cayman
     Islands (U.K.), Dominica, Grenada, Guadeloupe (France), Heard and McDonald Islands
26   (Australia), Jamaica, Martinique (France), Puerto Rico (U.S.), Saint Kitts and Nevis,
     Saint Lucia, Saint Vincent and the Grenadines, St. Helena (U.K.), St. Pierre and
27   Miquelon (France), United States, United States Minor Outlying Islands, British Virgin
     Islands (U.K.), and the U.S. Virgin Islands (U.S.)

28   [5] "*Presidential Directive on Electronic Commerce*," July 1, 1997.

COMPLAINT

1   Commerce the responsibility for Internet Protocol (IP) address space allocation, protocol

2   identifier assignment, generic (gTLD) and country code (ccTLD) Top-Level Domain

3   name system management, and root server system management functions. These

4   services were originally performed under U.S. Government contract by IANA and other

5   entities, which in turn would work with RIRs on IP address allocation matters. IANA has

6   been subsumed into ICANN, and ICANN is now responsible for the IANA function, to

7   include interfacing with RIRs.

8       **C. Defendant ARIN**

9       33.    ARIN, first and foremost, is the only registrar and registry of the property

10  commonly referred to as IP addresses and blocks of IP addresses, aka "NETBLOCKS,"

11  in the relevant market as defined in paragraph 9. ARIN's articles of incorporation further

12  reinforce ARIN's role as a custodian that manages Internet protocol resources and

13  manages the allocation and registration of such Internet protocol resources. ARIN's

14  articles of incorporation state that ARIN exists "to represent the internet community

15  nationally and internationally...", further emphasizing how ARIN derives its authority from

16  the owners of IP addresses or those applying for such ownership.

17       34.    ARIN exists as the steward[6] of at least two primary types of property:

18  unallocated IP address space, and IP addresses that have been allocated to owners.

19  Regarding both types of IP addresses, ARIN performs a variety of services pursuant to

20  its role as a register and registry:  allocation and assignment of IP address space;

21  assignment of autonomous system numbers ("ASNs"); inverse addressing on network

22  blocks; and maintenance of network records and administration of IP address space.

23

24

25  [6] ARIN actually uses the word "stewardship" to describe its role on the home pages of its
    website:  "Applying the principles of stewardship, ARIN, a nonprofit corporation,

26  allocates Internet Protocol resources; develops consensus-based policies; and facilitates
    the advancement of the Internet through information and educational outreach." The

27  American Heritage Dictionary defines "steward" as "one who manages another's
    property." *The American Heritage Dictionary of the English Language, Fourth Edition*,

28  2000.

                                                COMPLAINT

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

### III. ARIN's ANTICOMPETITIVE INTERESTS

35.    ARIN is the <u>only</u> registrar and registry for IP addresses and ASNs for any and all ISP's in ARIN's geographical region seeking to do business in the IP numbers market. There is no other registrar or registry for IP addresses and ASNs for businesses in ARIN's geographic region.

36.    The organizational operations of Defendant ARIN described above are rendered anticompetitive in purpose and effect in light of the intentional unification of economic interests shared by a controlling interest of its decision making bodies, and by its constituent members. Pursuant to these controlling anticompetitive interests, ARIN policy, which ARIN describes as vaguely as possible, is applied to exclude and control entry and presence in the market of competitors to those interests, including Plaintiff KREMEN.

#### A. Large ISP Industry Participants Serve as ARIN Management

37.    In that the entire membership of Defendant ARIN is comprised of members of the Internet Service Provider industry who have already been directly allocated IP address space by ARIN, ARIN is an inherently biased gatekeeper for the allocation of the primary resource required to compete in that industry. It is this membership that elects the ARIN Board of Trustees, who, along with the President, absolutely control and govern the entirety of ARIN's operations "in their sole discretion."

38.    Six members of the Board of Trustees are elected to three-year terms by ARIN's membership, comprised of ISP industry participants who have already been allocated IP address space.[7] The Board, in turn, has exclusive power to select the ARIN officers (Chairman, Treasurer, and Secretary) by majority vote, except for the President.

39.    The ARIN President and CEO are not elected but "hired" by the Board of Trustees, and serve under the entire term of an employment contract, the terms of which are created and authorized by the Board. The President sits as the seventh voting member of the ARIN Board for the entire term of their employment contract.

---

[7] ARIN Bylaws, VI.4.

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

COMPLAINT

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

40.    The President/CEO is the primary authoritarian of ARIN, and manages ARIN's day-to-day operations, executes all contracts and agreements on behalf of ARIN, and advises all other officers and committees, and has "full authority over the administration and management of ARIN, and further shall exercise such other powers as usually pertain to the chief operating official of an organization."[8]

**B. ARIN Management Gave Itself Absolute Discretion Over Policy Development and Administration**

41.    The ARIN Board operates with complete autonomy, in "its sole and absolute discretion." It governs in accordance with ARIN's "policies" – which the ARIN Board has exclusive authority to adopt, alter, amend, or repeal – specific notice of which it is not required to provide to its applicants.[9] The absolute and unquestioned authority of the ARIN Board and President is reiterated throughout the bylaws: ARIN acts "in its sole and exclusive discretion applying its published policies." Furthermore, "ARIN may, in its sole and absolute discretion, change, modify, suspend, or make improvements to any aspect of [its services], temporarily or permanently, at any time without specific notice to [the a]pplicant, and ARIN will not be liable for doing so." *Id.* "ARIN may, at any time in its sole and absolute discretion, amend the Policies or create new Policies and such amendments or new policies shall be binding upon Applicant thirty days after they are posted on ARIN's web site."

**C. Actual Control of ARIN Board is Held By Prominent ISP Industry Leaders In Competition With Applicants Seeking Allocation**

42.    Absolute control of the ARIN board is held by some of the most powerful and influential figures in the Internet service industry. With an industry participant base electing key industry figures who possess absolute discretion and control over entry, expansion, and allocation of resources in their own market place, ARIN's anticompetitive nature is apparent. Even ARIN's own bylaws acknowledge this inherent conflict:

---

[8] ARIN Bylaws, Sec. VII.5.

[9] ARIN Bylaws, Sec. VI.8.

COMPLAINT

1  "policies under consideration by ARIN are likely to have an impact on the business of

2  every Trustee."[10]

3      43.    At present, the ARIN Board consists of the following individuals, each of

4  them with significant commercial interests and affiliations in direct competition with ISP

5  newcomers to the IP Address market:

6      a.    President Raymond Plzak, Advisory Committee of the Internet

7  Society and Root Server System Advisory (RSSAC) and Security and Stability Advisory

8  (SSAC) Committees of the Internet Corporation for Assigned Names and Numbers

9  (ICANN);

10      b.    Chairman John Curran, Vice President and Chief Technical Officer

11  of ServerVault, a Dulles, Virginia full-service hosting provider; former Chief Technical

12  Officer of XO Communications, nationwide "backbone" internet and telecommunications

13  services provider; Chief Technical Officer of BBN Technologies, former division of GTE,

14  Verizon;

15      c.    Secretary Scott Bradner, University Technology Security Officer at

16  Harvard University; Secretary to the Board of Trustees of the Internet Society (ISOC);

17      d.    Treasurer Lee Howard, currently the director of network engineering

18  for Stanley Associates, a public sector IT and logistics consulting company; prior to

19  joining Stanley Associates, he worked at UUNET from 1997 until 2003;

20      e.    Bill Manning, formerly of Texas Instruments; contributing scientist on

21  CenterGate's UltraDNS, who serves on research staff at University of Southern

22  California's Information Sciences Institute; formerly Lead Engineer at Rice University;

23  currently works on enhancing DNS code to track the growth of IP networks;

24      f.    Bill Woodcock, founder of Zocalo, a multinational ISP, which he ran

25  from 1989 to 2002; and

26

27

28  [10] ARIN Bylaws, Sec. VI.12(a).

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

COMPLAINT

13

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

g.     Paul Vixie, Founder and President of Internet Systems Consortium, Inc. (ISC); he has served as President/CEO of PAIX, MIBH, which are large, international Internet networking and peering companies.

44.     While having no authority to direct or bind ARIN or its policies, ARIN also maintains an Advisory Committee, with whom the ARIN Board consults – at its discretion. Like the Board, the Advisory Committee is also comprised of individuals directly or indirectly involved in the ISP industry and the market for IP Addresses:

a.     Dan Alexander, currently Principal Engineer and formerly Lead Architect for Comcast Cable; formerly of Excite@Home.

b.     Paul Andersen, founder of egateNETWORKS Inc., a Toronto-based ISP; Vice-Chair of Canadian Internet Registration Authority (CIRA) Board of Directors.

c.     Cathy Aronson, recently a member of the technical staff at Packet Design; formerly of @Home (she was responsible for routing and IP addressing); formerly of Merit, Inc. (she worked on the NSFNET Backbone).

d.     Marla Azinger, Electric Lightwave, Frontier Communications and Citizens IP Addressing.

e.     Leo Bicknell, Senior Network Architect for Harrah's Entertainment, formerly of AboveNet, as an ISP backbone architect.

f.     Chairman Ron da Silva, Senior Director of Network Engineering and Technology for Time Warner Cable; formerly with AOL.

g.     Bill Darte, Senior Technical Programs Specialist with the Center for the Application of Information Technology (CAIT) at Washington University in St. Louis; Affiliate Professor teaching telecommunications and security subjects in the Master of Information Management degree program at Washington University in St. Louis.

h.     Mark Kosters, Vice-President of Research at VeriSign, former Senior Engineer at Data Defense Network (DDN) NIC; former Chief Engineer and Principal Investigator under the NSF- sponsored Internet NIC (InterNIC); he has

COMPLAINT

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.Kronenbergerlaw.com

1    represented both network information centers in various technical forums such as the

2    IETF, RIPE, APNIC, and NANOG.

3          i.     Vice Chairman Alec Peterson, currently Director of Product

4    Development for OmniTI, Inc.; co-founder of UltraDNS; co-founder and Chief

5    Technology Officer of Catbird Networks;  Staff scientist at Centergate Research Group,

6    LLC; former Manger of IP Backbone Planning for RCN, a national Internet company that

7    acquired Erols in January 1998; former Network Administrator and Architect for Panix.

8          j.     Matt Pounsett, Systems/Network administrator at CIRA since 2003;

9    member of Toronto Internet Exchange (TorIX); former Systems Administrator for Netcom

10   Canada/AT&T Canada; former Technical Analyst for Sprint Canada.

11         k.     Lea Roberts, employed by Stanford University for the past 40 years;

12   she has been part of the Networking Systems group for more than 20 years, where she

13   is the network architect for the campus IPv4 backbone network as well as in charge of

14   assigning IP address blocks for use by campus organizations; she is currently a member

15   of the Technical Advisory Council for CENIC, supporting CalREN2, which provides

16   Internet2 connectivity in California.

17         l.     Alex Rubenstein, owner/operator of Net Access Corporation (aka

18   nac.net), a large regional backbone Internet Service Provider.

19         m.     Robert Seastrom, former Director of Network Architecture at

20   Inter.Net Global Ltd.; co-founder and former President of the Cambridge Bandwidth

21   Consortium, a cooperative ISP in Cambridge, Massachusetts; formerly of Akamai

22   Technologies, AboveNet Communications, and Digex.

23         n.     Stacy Taylor, "IP Goddess" at Time Warner Telecom; former Senior

24   Technical Writer for Operations Systems Support; previously controlled all aspects of IP

25   addressing for the network at ICG Communications.

26         o.     Suzanne Woolf, Program Manager for the Internet Software

27   Consortium, a nonprofit organization dedicated to reference implementations of critical

28   network standards and other projects in the public interest of the global Internet.

COMPLAINT

45.    The above ISP industry professionals, directly or indirectly involved in the operation of large ISP businesses, or in the operations of ICANN, Verisign, and the other organizations from which ARIN derives its power and resources, are the sole, unquestioned managers and decision makers behind ARIN, with sole discretion in controlling the entry of any and all competing interests in to the ISP market.

## IV. ARIN's ANTICOMPETITIVE AND WRONGFUL ACTS

46.    Plaintiff KREMEN obtained a $65 million judgment, entered in the US District Court for the Northern District of California, against COHEN and against a variety of companies and alter egos of COHEN. This judgment, entered on April 3, 2001, also imposed a constructive trust on all of assets of COHEN, his companies and alter egos.

47.    At the time of the judgment, COHEN, or his companies and alter egos, owned blocks of Internet Protocol addresses ("NETBLOCK PROPERTY") that were, and currently are, in use and of substantial monetary value. As a result, KREMEN obtained a court order, dated September 17, 2001 (the "NETBLOCK ORDER") ordering the custodian of the NETBLOCK PROPERTY, Defendant ARIN, to transfer the NETBLOCK PROPERTY to KREMEN, thereby vesting in KREMEN all ownership and other rights in the NETBLOCK PROPERTY. KREMEN owned the NETBLOCK PROPERTY both in constructive trust and as a judgment creditor.

48.    KREMEN made multiple demands to ARIN to transfer the property free and clear to KREMEN. However, ARIN refused and continues to refuse to transfer the NETBLOCK PROPERTY to KREMEN, unless KREMEN entered into a mandatory side agreement with ARIN wherein KREMEN would effectively relinquish all of his property rights in the NETBLOCKS.

49.    In November 2001 Plaintiff KREMEN presented Defendant ARIN with this Court's September 2001 NETBLOCK ORDER, which expressly directed ARIN to transfer registration of the specifically identified NETBLOCK PROPERTY to KREMEN. The Order was as explicit as to provide the exact registration details to be used.[11]

[11] NETBLOCK ORDER, p. 2.

16

COMPLAINT

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

50.     Rather than complying with the unequivocal terms of the NETBLOCK ORDER, ARIN's response from the outset was that they "would work something out" with KREMEN regarding the NETBLOCK ORDER.  Seemingly unfazed by the Court's directives, ARIN, by and through its President Mr. Plzak and through its counsel, began a negotiation of the terms and conditions of its compliance with the Order.  In fact, all correspondence from ARIN regarding the NETBLOCK ORDER was designated as confidential settlement communications "PURSUANT TO § 408," indicating ARIN's intention to negotiate its own settled terms, rather than comply with those of the Court's order.

51.     ARIN's resistance to comply with the NETBLOCK ORDER continued through back-and-forth discussions between ARIN, its counsel, and Plaintiff KREMEN into 2005, culminating in ARIN's ultimate refusal to transfer the NETBLOCK PROPERTY as ordered.

A.     Refusal to Transfer Registration of Specified NETBLOCK PROPERTY to Plaintiff KREMEN

52.     At no point in the course of Plaintiff's dealings with ARIN did ARIN or its representatives indicate any desire, intention, or perceived obligation to comply with the terms of the NETBLOCK ORDER, nor have they ever done so.  As no less than a full, immediate, and uncompromised compliance with the NETBLOCK ORDER could have satisfied Plaintiff's entitlement, ARIN has at all times been in violation of it, and of Plaintiff's legal rights.

53.     While this alone would have been sufficient to constitute ARIN's wrongful disposition of Plaintiff's rights and property, other wrongs were committed.

B.     Act of Conditioning Plaintiff's (and Others') Registration Upon Submission of Detailed Disclosure of Trade Secrets, and Confidential Commercial and Private Information.

54.     In addition to refusing to comply with the specific scope of the NETBLOCK ORDER, ARIN also sought to condition the consideration of any registration of the

17

COMPLAINT

1   NETBLOCK PROPERTY upon KREMEN's submission of a detailed information or his

2   existing and future business operations. Mr. Plzak asserted a "policy" requiring Plaintiff's

3   disclosure to the ARIN administration of such sensitive and trade secret information as:

4       -   Plaintiff's and COHEN's existing customer lists;

5       -   A detailed inventory of all assets utilized by COHEN or to be utilized by

6           Plaintiff in connection with the NETBLOCK PROPERTY;

7       -   General and specific listings of the assets Plaintiff acquired from COHEN;

8       -   Network engineering plans including subnets, host counts, and hosts per

9           subnet, with projected use rates for one and two years;

10      -   Deployment schedules for the networks utilizing the Netblock addresses;

11      -   Network topology diagrams; and

12      -   Identification of specific software requirements.

13      55.     ARIN's management would then "evaluate" this critical information "in its

14  sole and exclusive discretion applying its published policies," to determine whether the

15  transfer order was "justified." ARIN's "policy" cited by Mr. Plzak reserved to ARIN the

16  right to reduce or eliminate the size and scope of KREMEN's NETBLOCK PROPERTY

17  pursuant to its evaluation.

18      56.     As applied to Plaintiff KREMEN, any such requirement or determination

19  would be contrary to the directive and purpose of the NETBLOCK ORDER as issued,

20  and diminish Plaintiff's award thereunder. The terms of the NETBLOCK ORDER were

21  clear and irrefutable, and even specified what information of Plaintiff was to be used in

22  the updated registry entries.[12]

23      57.     Furthermore, Plaintiff was unable to submit details regarding COHEN's

24  assets and operations, as such assets and operations were largely unidentified and the

25  subject of extensive investigatory efforts, due to COHEN's fraudulent transfers and other

26  attempts to avoid collection on the judgment. In that Plaintiff could not supply ARIN the

27  information requested, if Plaintiff would have submitted details of use of the NETBLOCK

28  ─────────────────────
    [12] NETBLOCK ORDER, p.2.

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

COMPLAINT